Filed 4/28/23  P. v. Dare CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARK ALAN DARE,<br><br>    Defendant and Appellant. | A164002<br><br>(Humboldt County<br>Super. Ct. No. CR1800523) |

Defendant appeals from his conviction on several counts of felony child molestation, raising challenges based on (1) the admission and exclusion of certain evidence, (2) instructional error, (3) prosecutorial misconduct, (4) the alleged ineffective assistance of his trial counsel, and (5) cumulative error. Defendant also contends we must remand for resentencing in light of changes to Penal Code section 1170, subdivision (b) that became effective after his sentencing. We reject defendant's challenges to his convictions, but conclude that remand for resentencing is required based on the recent statutory changes affecting the trial court's imposition of an upper term.

## I. BACKGROUND

### A. Factual Background

Dennis W. and W.D. were married in 1998. The couple had two daughters, Jane Doe 2 and Jane Doe 1, who were both born during the marriage. In 2004, Dennis and W.D. separated, and in 2005, they divorced.

After Dennis and W.D. separated, W.D. began dating defendant. In 2007, W.D. married defendant and moved into his home with her two daughters. Defendant's teenage son also lived in the home. Dennis and W.D. initially shared custody of the girls, but in 2010, Dennis moved to Missouri. In December 2010, W.D. gave birth to her son; defendant was the baby's father.

### 1. Jane Doe 2

Jane Doe 2's earliest memory of sexual abuse dates back to when she was in second grade and was eight or nine years old. On multiple nights— more than she could count—Doe 2 woke up in her bed[1] to being touched and stimulated. Sometimes defendant would get into Doe 2's bed with her; more often he would stand next to her bed and reach through the bars on the side of the bed. The abuse happened almost every night until it ended when she was in fourth or fifth grade.

One time, defendant crawled up into Doe 2's bed and laid down on her right side; another time he answered the phone while he was in bed with her. On one occasion, defendant touched her and then told her something about how glad he was that he could "calm [her] down."

The touching was mostly the same: while her sister slept on the bottom bunk, sometime after 8:30 or 9:00 p.m. until 11:00 or 11:30 p.m., defendant would first rub Doe 2's back, then rub her clitoris in a stimulating motion. Sometimes he also touched her breasts and buttocks beneath her clothes.

When the abuse was happening, Doe 2 felt "super confused" and "didn't know what was going on." She had a feeling it was bad because it would happen at night when no one was around. She posted to a discussion forum

---

[1] Doe 2 shared a bunk bed with her little sister, Doe 1. Doe 2 slept in the top bunk and Doe 1 slept in the bottom bunk.

2

on a menstrual cycle tracking application called "Pink Pad" about what had been happening to her and asked whether it was rape. Someone responded and told her she was being molested and needed to talk to someone about it. Doe 2 did not feel like she could tell any adults or her school at the time, but in fifth grade she told her friend she was being molested. Doe 2 also disclosed the abuse to a friend and the friend's mother in her sophomore or junior year of high school.

### 2. Jane Doe 1

Beginning before her younger brother was born in 2010, defendant touched Jane Doe 1 sexually approximately two or three times per week at night when she was in her bed. During one incident she remembered, Doe 1 was barely asleep and was awakened by defendant's mouth on her bare vagina. Sometimes he would put his finger in her vagina and grope her legs. One time, she awakened to defendant placing her hand on his penis. Another time, he put his mouth on her vagina and put his finger in her vagina.

Doe 1 also recalled a time when defendant touched her in her mother and defendant's bedroom. She was lying on the bed with her pants and underwear off and defendant put his mouth on her vagina.

Another time when Doe 1 was preparing to take a shower, defendant put her on the countertop next to the sink and "started doing oral." He put his mouth on her vagina and put his finger in her vagina.

During most of these touching incidents, defendant would not say anything, but sometimes he would say, " 'Good girl.' " Once, he told her it was a game and she could not tell anyone. After many of the incidents he would buy her toys—she remembered receiving "a lot of My Little Ponies."

When she was young, Doe 1 did not realize the sexual abuse was wrong and did not disclose it at that time. At some point, Doe 1 tried to tell a

counselor at school about the abuse, but she decided not to disclose when the counselor informed her they would need to tell her parents if someone was hurting her. In eighth grade, Doe 1 disclosed to her basketball coach that she had been physically and sexually abused by her stepfather when she was younger. Although he was a mandated reporter, her coach did not report the disclosure because of her demeanor and the nonchalant manner in which she made the disclosure.[2]

### 3. Formal Reports of Abuse

Jane Doe 1 disclosed the abuse to a teacher in her freshman year of high school. The teacher escorted Doe 1 to the school office, where she disclosed to school counselors and then the school police officer. The school informed Dennis W. of Doe 1's disclosure, and Dennis discussed it with Doe 1.

Jane Doe 2 reported the molestation to law enforcement in early 2018, after learning about Doe 1's disclosure.

### 4. Investigation and Searches

An investigator with the district attorney's office conducted a search of defendant's cell phone and reviewed a timeline of the events of January 22, 2018. He found a text message sent from defendant to W.D. at 7:44 p.m., asking if the life insurance was " 'paid up.' " Also at 7:44 p.m., there were Google searches for "Suboxone," "Suboxone, lethal dose," and "bupe." Immediately thereafter was a responsive text from W.D. confirming the life insurance was paid up, followed by a text from defendant to W.D. stating: " 'Good. If somebody shoots me or whatever.' " Thereafter, there was a search for " 'Bupe, . . . 'Suboxone and Xanax[???] deadly[?] safe[?]' " The

---

[2] The basketball coach testified at trial that Doe 1 disclosed she was abused but he did not know whether it was sexual in nature. On further examination, he conceded he had previously told an investigator it was "sexual" abuse.

4

investigator knew " 'bupe' " to be a slang term for Suboxone based on his training and experience.

Detective Donald Rowberry, who was qualified at trial as an expert in computer forensics and child pornography, performed searches of defendant's computer hard drives. Rowberry located 18 visits to the website "motherless.com," 16 of which were associated with the user name "M. Dare" from October 2011; 34 searches for website links related to "motherless.com" on the computer's search history from the deleted or "unallocated" space on the hard drive from October 2011; and query searches within the "motherless.com" website for the search terms " 'young teen' " and " 'teen.' " Rowberry testified that in his experience, the only times he had seen motherless.com show up in a web history is during a child pornography or child molestation investigation. Rowberry also discovered several Google searches regarding the statute of limitations for molestation conducted on September 26, 2013; two video clips which he classified as "child pornography" on the unallocated space; and a JPEG file in note format stating, " 'Mark, my husband, please make sure you keep yourself in check while on this computer. I've gone through it, and I think I cleared the disgusting things you had hidden. This reminder is out of love and nothing more.' "

### 5. Procedural History

On October 25, 2019, the Humboldt County District Attorney filed a first amended information charging defendant with two counts of oral copulation or sexual penetration with a child 10 years old or younger as to Jane Doe 1 for the year 2010 (Pen. Code, § 288.7, subd. (b); counts 1 & 2); continuous sexual abuse of a child under 14 years old as to Jane Doe 1 for the years 2010 to 2012 (*id.*, § 288.5, subd. (a); count 3); and continuous sexual

abuse of a child under 14 years old as to Jane Doe 2 for the years 2008 to 2010 (*id.*, § 288.5, subd. (a); count 4). Special allegations were included as to counts 3 and 4 that defendant had substantial sexual conduct with the victims who were under 14 years old (*id.*, § 1203.066, subd. (a)(8)), and as to all counts, that defendant committed the offenses against more than one victim under the age of 14 years within the meaning of Penal Code section 667.61, subdivisions (j)(2) and (e). The day before trial, the prosecution dismissed count 3 and orally amended count 1 to specify oral copulation as the prohibited act, and count 2 to specify sexual penetration as the prohibited act.

After deliberating less than two hours, a jury found defendant guilty on counts 1, 2, and 4, and found true the special allegations. On October 29, 2021, the trial court sentenced defendant to an aggregate term of 46 years to life in prison. The court struck the enhancement under Penal Code section 667.61, subdivision (j)(2) upon agreement of the parties. Defendant timely appealed.

## II. DISCUSSION

### A. *Evidence of Prior Sexual Conduct*

Defendant first contends the trial court prejudicially erred by striking Doe 2's cross-examination testimony that when she was seven or eight years old, her young friend asked Doe 2 to "kiss or something her pubic area"; that Doe 2 talked with her parents about it; and that W.D. told Doe 2 it was wrong. Defendant asserts such evidence was highly relevant to Doe 2's credibility and its exclusion violated his federal and state constitutional rights in a close case which hinged entirely on the credibility of Does 1 and 2.

### 1. Additional Background

6

On direct examination, Doe 2 testified that her first memory of defendant's molestation was when she was in second grade; she was eight or nine years old. After Doe 2 described the acts of molestation, the prosecutor asked Doe 2 how she felt when the abuse was happening to her. Doe 2 responded: "I was super confused. I didn't know what was going on. I had a feeling that it was, like, bad because it would happen at night and when nobody was around, so I had a weird inkling about it, so I ended up looking into it myself."

Later, on cross-examination, Doe 2 testified that when she was seven or eight years old she had a playdate with a friend who asked her to "kiss or something her pubic area or something." Doe 2 did not remember doing it, but she did talk to her parents about it. Doe 2 testified: "I just remember them asking me what had happened, and then I told them and then they told me like, you don't do that with your friends, kind of thing, not to touch people there if I don't want to." She also testified the conversation "never went beyond that one discussion."

After Doe 2 completed her testimony, the prosecutor moved to strike the evidence regarding Doe 2's friend and her subsequent conversation with her parents. The prosecutor argued that she was never given any discovery on the issue and allowing the testimony directly contravened the trial court's ruling that the defense was not allowed to bring up any prior sexual act of the complaining witnesses.

Defense counsel argued the testimony did not involve a sexual act, but only "age-appropriate playful conduct between two 7- or 8-year olds." In any event, defense counsel asserted the evidence went "directly to impeachment and credibility" because Doe 2 had a conversation with her parents about appropriate and inappropriate touching. He argued the evidence was

7

relevant to "impeach her based on her testimony that she had no idea what was happening to her."

The trial court excluded the evidence, explaining: "I don't know how you can qualify 'please kiss my private part,' . . . as nonsexual. Definitely falls within that frame. You can qualify it as children not necessarily knowing the full ramification of what they were doing, but that would certainly land within the parameters of the Motion in Limine."

The trial court subsequently instructed the jury: "Ladies and gentlemen, yesterday you heard testimony involving a young person . . . and the alleged or the conduct was when Jane Doe was 7 or 8 and then a subsequent conversation with Dennis and [W.D.]. [¶] Ladies and gentlemen, I am striking that testimony from the trial. You are not to consider it for any purpose. I am asking you to set it aside and not use it in your deliberation, and it will not be referred to during the rest of the trial because it is irrelevant."

### 2. Analysis

Defendant contends the trial court erred because (1) Doe 2's testimony was not evidence of sexual conduct, and (2) it was critically important to the jury's evaluation of her credibility.

Generally, evidence of a complaining witness's prior sexual conduct is inadmissible in a sex crimes case, but a limited exception allows such evidence to be admitted if it is relevant to the victim's credibility. (Evid. Code, §§ 1103, subd. (c) & 782, subds. (a), (c)(1).) In a prosecution under Penal Code section 288.5, "Evidence Code section 782 provides for a strict procedure that includes a hearing outside of the presence of the jury prior to the admission of evidence of the complaining witness's sexual conduct. [Citation.] Evidence Code section 782 is designed to protect victims of

molestation from 'embarrassing personal disclosures' unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility. [Citation.] If, after review, 'the court finds the evidence relevant and not inadmissible pursuant to Evidence Code section 352, it may make an order stating what evidence may be introduced and the nature of the questions permitted.' " (*People v. Bautista* (2008) 163 Cal.App.4th 762, 782; *People v. Mestas* (2013) 217 Cal.App.4th 1509, 1514 (*Mestas*).) We review the trial court's decision to exclude such evidence for an abuse of discretion. (*Bautista*, at p. 782.)

First, we reject defendant's contention that the trial court's decision to exclude Doe 2's testimony violated his federal due process rights and his right to present a defense. "[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957.) "[O]nly evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.) At most, the exclusion of Doe 2's brief testimony limited defendant's ability to impeach one vague statement about whether she understood what defendant was doing to her and whether it was appropriate. There was no violation of defendant's constitutional rights. (*Mestas, supra,* 217 Cal.App.4th at p. 1517.)

Second, defendant has not shown the trial court abused its discretion in excluding the evidence under Evidence Code section 782. Although he contends the conversation between Doe 2 and her friend was not evidence of "sexual activity," Doe 2's memory was vague as to whether she had actually engaged in any kissing or touching with her friend. In any event, courts have construed "sexual conduct" within the meaning of Evidence Code section 782

9

broadly. (See *People v. Franklin* (1994) 25 Cal.App.4th 328, 334, fn. omitted (*Franklin*) ["[S]exual conduct . . . encompasses any behavior that reflects the actor's or speaker's willingness to engage in sexual activity. The term should not be narrowly construed."]; *People v. Casas* (1986) 181 Cal.App.3d 889, 895 [verbal communication between sexual assault victim and third party reflected her willingness to have sex for money].)

Third, regardless of whether the evidence qualifies as prior sexual conduct, it was irrelevant. (See *Franklin, supra,* 25 Cal.App.4th at p. 335 [court need not decide whether certain evidence constituted sexual conduct because it was properly excluded on grounds it was irrelevant and would require undue consumption of time].) Defendant argues the testimony was relevant to impeach Doe 2's testimony that she was confused about defendant's acts of molestation and "didn't know what was going on." But evidence that Doe 2's parents told her when she was seven or eight years old that she should not let a *friend* touch or kiss her "private parts" does not tend to prove that she should have known at age eight or nine that her stepfather's acts of abuse fell in the same category.

Defendant's attempt to draw an analogy between the exclusion of Doe 2's testimony and cases such as *People v. Adams* (1988) 198 Cal.App.3d 10, 16, 18–19 and *Franklin*, *supra*, 25 Cal.App.4th 328, in which courts excluded prior false claims of sexual assault, is unavailing. Evidence that a victim has previously made a false allegation about similar sexual abuse is clearly more relevant to a victim's credibility than the evidence in this case. "The fact that a witness stated something that is not true as true is relevant on the witness's credibility whether she fabricated the incident or fantasized it." (*Franklin*, at p. 335.) Here, however, there was no evidence that Doe 2 made a prior false allegation of sexual abuse. Rather, the evidence defendant

sought to introduce concerned her understanding as a very young child about whether a particular sexual act with a peer was "wrong" or "bad." As we have already explained, that conversation had little bearing on the veracity of her testimony that she was confused about sexual touching and acts of molestation by her stepfather.

In any event, even if the exclusion was error, it was harmless. Ample evidence was introduced to the effect that Doe 2 suspected, knew, or learned that defendant's acts were wrong before she disclosed the abuse. First, Doe 2 herself stated she "had a feeling that it was . . . bad" and "had a weird inkling about it" while the abuse was happening. Further, W.D. testified that she had conversations with her daughters, especially Doe 2, about inappropriate touching in their " 'no-no' " areas, including below the belt and their breast area. W.D. also told the girls that no one could touch these areas except their mother, father, and doctors. Both of these conversations suggested much more directly and strongly that the acts of molestation were wrong than the brief conversation about Doe 2's friend when she was seven or eight years old. Moreover, W.D. testified that on multiple occasions, Dennis threatened to kill defendant if he ever touched the girls, and that Dennis said that in front of the girls. Finally, when she was in the fifth grade, Doe 2 posted to a discussion forum about what was happening to her and was told she was being molested and needed to tell someone. Given the substantial evidence suggesting Doe 2 knew or had reason to suspect defendant's behavior was "wrong" but still delayed reporting the abuse for many years, it is not likely defendant would have received a different result had the jury been allowed to consider her conversation with her young friend and her parents when she was seven or eight years old. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Finally, the evidence of defendant's guilt was overwhelming. Both girls testified about defendant's abuse; the jury was allowed to consider Doe 1's testimony regarding defendant's molestation as propensity evidence in deciding the charge involving Doe 2. There was ample corroboration of both girls' testimony as they both disclosed the abuse informally to others, and those individuals testified at trial. Further, the evidence that defendant had conducted multiple searches of a commercial pornography website using the terms " 'teen' " and " 'young teen,' " and searched for the statute of limitations related to molestation constitutes strong evidence of guilt. On this record, it is not reasonably probable the excluded testimony would have changed the outcome.

## B. Character Evidence

Next defendant contends the trial court erred by allowing the jury to hear inflammatory and inadmissible character evidence that he had an affair, paid a prostitute for oral sex, "trolled" prostitution websites, and met women on the Internet for sex. Defendant asserts the evidence served only to portray him as a sexual deviant and improperly sought to impeach testimony of his good character with specific instances of conduct.

### 1. Additional Background

The prosecution filed a motion in limine seeking to introduce, pursuant to Evidence Code section 1101, subdivision (b), "evidence of the defendant's internet search history." Defendant objected and sought an Evidence Code section 402 hearing (section 402 hearing) and an offer of proof to show "any relationship between any of the pornography, or pornographic site search history, located on the defendant's computer to pedophilia and the crimes [of which he was accused]."

At the section 402 hearing, Detective Rowberry testified about searches located on defendant's computer for the websites motherless.com, Backpage.com, and Craigslist. Rowberry testified the Backpage.com and Craigslist searches were for "potential prostitution" and confirmed both sites were categorized as human trafficking sites. At the conclusion of the hearing, the trial court excluded evidence of searches on Craigslist, but allowed the searches on Backpage.com as character evidence in rebuttal.

At trial, W.D. testified on direct examination that she and defendant had a "[f]un, adventurous, good, satisfying" sex life. She shared specific information about her sex life with defendant, including details about their typical sexual routine, use of pornography, communication about sex, and boundaries they had established in their sexual relationship. On cross-examination, W.D. confirmed she had a "normal, satisfying sex life" with defendant.

The prosecutor asked defendant if he had heard W.D.'s testimony "that the two of you have a fulfilling and satisfying sex life." Defendant responded that he had, and he agreed with her. He then admitted he had an affair outside of his marriage. When asked if he had affairs with more than one person, he responded he "talked to a lot of people" and "did a lot of e-mailing" with people through Craigslist, but he did not meet all of them; there was one person with whom he spent a lot of time and had a sexual affair. He confirmed W.D. would be telling the truth if she said he was meeting up with girls on Craigslist and cheating on her. Defense counsel did not object to this line of questioning. Defendant denied paying any of the women with whom he had affairs.

The prosecution introduced evidence of defendant's Backpage.com searches through defendant's own testimony. The prosecutor asked

defendant whether he had visited Backpage.com, and he responded: "Yeah. I'd seen a news story on it and I looked through it. I didn't utilize it for anything, though. [¶] I was just—you know, like you said, it was a human trafficking thing. There was a news story on it so I looked to see in different places what was there, and I couldn't tell. It looked like a bunch of advertisements for prostitutes, but I didn't utilize it." When asked how many times he visited Backpage.com looking at prostitutes, defendant said: "I don't know. I wasn't, like, looking at prostitutes through the site. They actually have a section that's purported to be like a Craigslist thing. That's supposed to be amateur people or whatever, so I looked at it, but I don't think that it was actually active. I don't know. I couldn't tell." Defendant denied meeting anyone off of Backpage.com.

The prosecution sought permission to call Dorothy G. as a rebuttal witness, who would testify defendant had hired her to orally copulate him on a number of occasions. Defendant objected under Evidence Code section 352, arguing the evidence was not proper impeachment, was irrelevant, and was cumulative to other testimony. The prosecutor argued that defendant had presented character witnesses and denied during cross-examination that he ever used a prostitute or paid for sex. The prosecutor further argued that soliciting a prostitute is a crime of moral turpitude and that character witnesses may be impeached by such crimes. Finally, the prosecutor contended, Dorothy G.'s testimony would contradict defendant's testimony that his sex life was normal. The trial court allowed her testimony, reasoning that the defense had asked W.D. questions about their sex life and argued defendant would not have time for prostitution, the evidence might go to his impulsive behavior, character witnesses can be impeached by crimes of moral turpitude, and Dorothy G.'s testimony would contradict defendant's

14

testimony that he never paid for sex. The trial court suggested it might exclude evidence as to the nature of the sex act—that it was oral sex—but defense counsel responded that was not necessary as it would not confer any additional stigma.

Dorothy G. testified that she worked as a prostitute. Defendant picked her up more than three times. She would perform oral sex on defendant for "about" $60. Defendant denied ever seeing Dorothy G. prior to her testimony, denied paying her for sex, and reiterated his prior testimony that he had never paid for sex.

### 2. Analysis

As an initial matter, defendant concedes he has forfeited some of his challenges to this evidence by failing to object in the trial court. Defendant did not object to Dorothy G.'s testimony or evidence of his extramarital affairs on the basis that it was inadmissible character evidence. Defendant urges us to exercise our discretion to consider these arguments notwithstanding his failure to object, but does not articulate any sound reason for doing so. (Evid. Code, § 353, subd. (a); *People v. Clark* (1992) 3 Cal.4th 41, 125–126 [absent a timely and specific objection on grounds urged on appeal, appellate court will not review trial court's admissibility ruling].)

Even if defendant did not forfeit his objections, however, the trial court did not abuse its discretion in allowing the evidence. When a testifying defendant in a criminal case offers evidence of specific conduct affecting his credibility and good moral character, the prosecution is not precluded from impeaching him with evidence of relevant specific instances of his conduct. (*People v. Lankford* (1989) 210 Cal.App.3d 227, 235–240; Evid. Code, § 780 [fact finder may consider matters relevant to truthfulness of witness testimony].)

15

Here, defense counsel elicited extensive testimony from W.D. about the nature of her sexual relationship with defendant to prove that she and defendant had a normal, satisfying sexual relationship, and defendant confirmed and agreed with her testimony. Evidence that defendant was looking at Backpage.com for prostitutes, having affairs outside of his marriage, and paying a prostitute for sex was thus appropriately admitted to challenge defendant's credibility, notwithstanding that it also rebutted his character evidence in the form of specific incidents of conduct. Moreover, the evidence that defendant engaged in conduct involving moral turpitude (i.e., prostitution), was admissible to impeach his credibility as a testifying witness. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295–296 [evidence of misconduct involving moral turpitude may be admissible for impeachment because it may suggest a willingness to lie]; *People v. Clark* (2011) 52 Cal.4th 856, 931 ["A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352."]; *People v. Chandler* (1997) 56 Cal.App.4th 703, 709 [prostitution is a crime of moral turpitude].) In addition, defendant denied paying any of the women with whom he had an affair. Dorothy G.'s testimony was relevant and admissible to directly impeach that testimony. (Evid. Code, § 780, subd. (i).)

Regardless, even if the trial court erred in admitting the evidence, we conclude the error was harmless on this record. First, as we have already discussed, the evidence against defendant was so strong as to be overwhelming. Moreover, evidence that he had affairs with adults outside of his marriage, was looking for prostitutes on a website, and hired an adult prostitute on a few occasions was of minor significance compared with the magnitude of the charged offenses. (See *People v. Marks* (2003) 31 Cal.4th

16

197, 229.) On this record, it is not reasonably probable defendant would have achieved a more favorable outcome had the evidence been excluded and, accordingly, any error in admitting it was harmless. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

## C. Instruction on Consciousness of Guilt

Defendant next argues the trial court erred by instructing the jury that it could consider evidence that he searched the Internet for lethal doses of medications after hearing of the abuse allegations as consciousness of guilt. Defendant contends the instructional error requires reversal under state law because there was no substantial evidence he attempted to commit suicide and he was prejudiced by the instruction.[3]

In a motion in limine, the prosecution sought to introduce evidence that after W.D. told defendant about the accusations, he texted her asking if the life insurance was " 'paid up,' " then conducted Internet searches for lethal doses of Suboxone and Xanax. The prosecution argued the evidence reflected consciousness of guilt. Defense counsel objected that drawing an inference of consciousness of guilt from the computer searches was "pure speculation" and was prejudicial.

After conducting some legal research, the trial court stated its intent to allow the evidence and added it would read CALCRIM No. 372 if requested. At trial, the court read the following modified instruction to the jury: "If the defendant made plans to commit suicide after he was accused of the conduct,

---

[3] Although defendant states cursorily that the trial court erred by admitting evidence of his searches for lethal doses of the medications, he does not develop the argument. Accordingly, we address only his claim of instructional error. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [when appellant fails to support a point with reasoned argument and citations to authority, we treat the point as waived].)

17

that conduct may show that he was aware of his guilt. If you conclude the defendant made plans to commit suicide, it is up to you to decide the means[4] and importance of that conduct. However, evidence that the defendant made plans to commit suicide cannot prove guilt by itself."

The court has a sua sponte duty to instruct on flight whenever the prosecution relies on evidence of flight to show consciousness of guilt. (Pen. Code, § 1127c; *People v. Abilez* (2007) 41 Cal.4th 472, 521–522.) " ' " '[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " ' [Citation.] While physical flight to evade capture or escape from custody are two obvious examples of relevant conduct, the courts have long held ' "[a]*ny conduct* of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible . . . ." ' [Citation.] '[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference [of consciousness of guilt].' " (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497–498, italics added by *Pettigrew* (*Pettigrew*).) " 'The evidentiary basis for the flight instruction requires sufficient, not uncontradicted evidence.' " (*Id.* at p. 499.)

We review a claim of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) Reversal is required only if the instructional error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *Watson, supra,* 46 Cal.2d at p. 836.)

In *Pettigrew*, the court held it was error to instruct on flight, pursuant to CALCRIM No. 372, where there was no evidence the defendant attempted

---

[4] The written instruction provided to the jury stated this word was "meaning."

to flee after the crime or escape from custody after his arrest. (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 499.) After his arrest, however, the defendant twice tried to hang himself with his clothing in his jail cell. (*Id.* at p. 488.) Under the circumstances, the *Pettigrew* court determined it would have been appropriate for the trial court to draft an instruction based on the pattern instructions and relevant cases regarding the defendant's suicide attempts as evidence of consciousness of guilt. (*Id.* at pp. 499–500.)

Defendant contends that here, unlike in *Pettigrew*, there was no substantial evidence that he attempted to commit suicide, only evidence that he conducted an Internet search. Defendant fails to acknowledge, however, that in addition to the evidence that he conducted repeated searches for lethal doses of medications after asking if his life insurance was paid and immediately after hearing about the abuse allegations, his own testimony affirmed that he was considering suicide in response to the disclosures. In explaining why he conducted the search, defendant testified "it was a technique [he] used growing up when [his] life was out of control." He would "carry a razor blade in [his] wallet, and when [he] didn't have control over the situation, [he] would look at that and [he] would say [he] could take control of [his] life that way." He knew that he could "stop things" so it "popped into [his] head" and he became "curious on how much [Suboxone] you would have to take." When asked if he was contemplating killing himself when he conducted the searches, he responded his "life had suddenly gone out of control," he had "those same thoughts," and he "thought, Well, how would I? And that was a way . . . ." Defendant also testified he had a prescription for and was taking Suboxone. Although defendant denied trying to kill himself and stated he had "had three years to follow through, and [is] not interested in doing it" because it would not be "a good example to [his] kids," a jury

could reasonably infer from defendant's actions and statements that at the time of the disclosures, he was making plans to commit suicide by researching the amount of a drug already in his possession that he would need to take to kill himself. Given the timing of these thoughts and Internet searches immediately after he learned Does 1 and 2 had disclosed the abuse to law enforcement, the jury could reasonably infer from his testimony that defendant's contemplations of suicide were motivated, at least in part, by an effort to evade prosecution or responsibility for the abuse.

Thus, we conclude defendant's testimony together with the evidence of his Internet searches could support a reasonable inference defendant was making plans to commit suicide, reflecting consciousness of guilt. The trial court instructed the jury with a modified version of CALCRIM No. 372, that it could use such evidence for the limited purpose of deciding *whether* defendant had made plans to commit suicide and *if so* what importance those plans had. It further instructed that evidence defendant made such plans could not prove guilt by itself. On this record, defendant has not shown the instruction was erroneous as a matter of law or unsupported by substantial evidence.

In any event, even if the trial court erred in instructing the jury with CALCRIM No. 372, we conclude the error was harmless. As we have previously discussed, in light of the overwhelming evidence of defendant's guilt, including the extensive testimony by Doe 1 and Doe 2, which the jury obviously credited, and the substantial corroboration of their testimony, there is no reasonable probability the jury would have reached a more favorable result in the absence of the instruction.

## D. Prosecutorial Misconduct

Defendant next argues the prosecutor repeatedly engaged in misconduct by referring to the two videos located by Detective Rowberry on defendant's computer as "child pornography" during her cross-examination of W.D. Defendant asserts the characterization was an attempt to "smuggle[] in inadmissible expert opinion that could not be argued openly and legally."

### 1. Additional Background

As discussed above, the trial court conducted a section 402 hearing with the prosecution's expert witness, Detective Rowberry, to address the prosecution's motion to admit evidence of child pornography found on defendant's computer under Evidence Code sections 1108 and 1101, subdivision (b). At the conclusion of the section 402 hearing, the court ruled that two videos (and other evidence) were admissible under sections 1108 and 352.

After several trial witnesses had testified, but prior to Rowberry's testimony, defense counsel moved to exclude any reference to the two videos as "child pornography" because the question whether such material was in fact child pornography was for the jury to determine. Defense counsel argued that "even in questioning" it would be "conclusionary in [*sic*] the determination that should be left in the hands of the jury." The trial court ruled the parties should treat the topic as they would the identification of drugs by an expert at a preliminary hearing. Specifically, the court directed that the expert could "go into his training and experience . . . and he should state it. It should be couched that this is his opinion rather than it is a conclusion. And he does have training in child pornography and the identification of child pornography so that we can use those words." The court agreed that the ultimate issue of whether the evidence constituted child pornography was up to the jury.

21

During her examination of Rowberry, the prosecutor asked whether Rowberry would classify the two videos as child pornography based on his training and experience. He responded: "I would say the first one where you can see her breasts. And then the second, I would say, is basically called child pornography if it doesn't show any genitalia or anything but it's related: then we call it child pornography."

Later, during the defense case, W.D. testified on direct examination that she had asked defendant not to watch pornography because it was not appropriate for their relationship. She found and deleted adult pornography on his computer, but she did not find images of child or teenage pornography.

On cross-examination, the prosecutor asked W.D. a series of questions based on Rowberry's testimony regarding the two videos he found on defendant's computer. The prosecutor asked W.D. whether she was "aware" that the expert "found a video that he classified as child pornography" on one of the computers in her house. Defense counsel objected; the trial court directed counsel to "ask it a different way."

The prosecutor then asked whether W.D. had "heard that the People's computer forensic expert found a video classified as 'child pornography' on a computer" in her home. Defense counsel again objected, and the trial court admonished the jury as follows: "Ladies and gentlemen, the objection here, as you heard in opening statements and as you'll hear in closing statements, you are the deciders of the facts. You will decide whether or not it is child pornography. However, there was testimony provided by an expert and now this witness is being cross-examined. Please remember your duties in this case to determine the facts."

The prosecutor then asked W.D., "[N]ow that you've heard that an expert in this case found a video that that expert classified as child

pornography and found it on a computer that's associated with your husband, does that change your opinion of [him]?" After W.D. responded she would have to see the evidence herself, the prosecutor asked her about "another video" found by the expert, noting "the expert testified that that was child erotica."

At a morning recess in chambers after the cross-examination, the court addressed counsel, stating, "I wanted to make a record because cross-examining [W.D.] came close to the line that I previously made so I just want to reemphasize that with counsel." The court admonished that "when talking about whether or not that is child pornography or child erotica or something else, counsel should be careful to couch it in terms as I've previously ruled, treating it much as if it were some other form of contraband that has not yet been decided. [¶] If you want to argue to the jurors that it's pornography, that's fine, but it should be presented to—by impeaching witnesses. It should be presented as suspected child pornography, but it should not be referred to in the conclusionary statements as child pornography. That is why I instructed the jury as I did. I don't want to keep doing that." The trial court then emphasized, "I think it's impeachable evidence and you can certainly ask people about that, just be careful how you refer to it, not as a conclusionary statement, so I don't have to reinstruct the jury each time."

The prosecutor then asked for clarification about how she could examine witnesses on the issue, and the court further explained its ruling, emphasizing that "it shouldn't be in a conclusory statement as if this is already decided" because the determination whether the videos were child pornography was for the jury.

**2. Analysis**

" 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the *federal* Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.]  Under *state law*, a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' " (*People v. Salcido* (2008) 44 Cal.4th 93, 152.)

Defendant argues the prosecutor committed misconduct during the cross-examination of W.D. by repeatedly referencing the expert's opinion that the videos found on defendant's computer were "child pornography," in violation of the trial court's prior rulings.  Relying on *People v. Villa* (1980) 109 Cal.App.3d 360, 365 (*Villa*), defendant contends the prosecutor's repeated references to the videos as child pornography was an attempt to "smuggl[e] in by inference . . . claims that could not be argued openly and legally."

*Villa*, however, is inapposite.  In that case, the prosecutor committed misconduct by making numerous speaking objections, inappropriate comments, and interrupting defense counsel's closing argument with references to undisclosed evidence regarding the defendant's prior sexual conduct.  (*Villa, supra*, 109 Cal.App.3d at pp. 363–364.)  The court concluded that the prosecutor's insinuations that highly relevant and damaging evidence about the defendant's prior sexual conduct existed but was not being presented to the jury was clear misconduct.  (*Id*. at p. 364.)  Moreover, the trial court's usual instruction that counsel's statements are not evidence could not cure the error because the court did not admonish the jury to

24

disregard the prosecutor's suggestions and in fact sustained the prosecutor's objections accompanying his improper statements.[5] (*Id.* at pp. 367–368.)

Here, by contrast, the prosecutor referred to an opinion already offered by the expert, not undisclosed evidence, and the trial court specifically instructed the jury, during the prosecutor's questioning, that the jury would determine the facts, including whether the evidence is child pornography.[6] Moreover, while defendant contends the trial court "cautioned the prosecutor not to refer to the evidence as 'child pornography' " and "warned the prosecutor that the questions should be couched in terms as the court had 'previously ruled,' " the colloquy between the court and counsel reveals that the trial court was clarifying its ruling with respect to how the parties should characterize the videos when examining witnesses. Indeed, in offering its explanation, the court began by telling counsel: "I wanted to make a record because cross-examining [W.D.] came close to the line that I previously made so I just want to reemphasize that with counsel." Defendant does not point to any violations by the prosecutor after the court offered its warning.

In any event, we conclude any error in referencing the expert's opinion that the videos were child pornography was harmless. The trial court explicitly instructed the jury that "you are the deciders of the facts," "You will

_____

[5] Nonetheless, as the Attorney General observes, the *Villa* court concluded that despite the clear misconduct which had a significant impact, the error was harmless based on the "lopsided weight of the evidence," where the defendant's testimony was not convincing and the victim's testimony was corroborated by other evidence. (*Villa, supra,* 109 Cal.App.3d at pp. 367–368.) As to its harmless error analysis, the *Villa* case is similar to the circumstances of this case because the evidence against defendant is so strong.

[6] For this reason, we find unpersuasive defendant's reliance on the principle that a prosecutor's argument to the jury incorporating statements of fact not in evidence constitutes misconduct.

25

decide whether or not it is child pornography," and reminded jurors of their "duties in this case to determine the facts." We presume the jury followed this instruction. (*People v. Parker* (2022) 13 Cal.5th 1, 71.) On this record, to the extent the prosecutor's questions constituted misconduct, and given the overwhelming evidence supporting the verdicts, defendant was not prejudiced.

## E. Ineffective Assistance of Counsel

Defendant argues his trial counsel committed six errors at trial that violated his federal and state constitutional rights and require reversal. Alternatively, he asserts, the errors require reversal under state law.

Under the Sixth Amendment and the California Constitution, a criminal defendant has the right to the assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) " '[T]he right to counsel is the right to the effective assistance of counsel.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).)

To establish an ineffective assistance of counsel claim, a defendant must show counsel's performance fell below an objective standard of reasonableness under "prevailing professional norms" and, as a consequence, the defendant was prejudiced. (*Strickland*, *supra*, 466 U.S. at pp. 687–688; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.) The standard for prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*; *People v. Jennings* (1991) 53 Cal.3d 334, 357.)

### 1. Failure to Follow Procedures Under Evidence Code Section 782

In his first argument presented in this appeal, defendant contends the trial court erred by excluding evidence that when Doe 2 was seven or eight years old, her young friend asked Doe 2 to "kiss or something her pubic area"; that Doe 2 talked with her parents about it; and that W.D. told Doe 2 it was wrong. Defendant asserts that to the extent this court concludes such evidence was subject to the requirements of Evidence Code section 782, defense counsel rendered ineffective assistance by failing to follow the procedures required for admission of that evidence under the statute.

As we have explained above, however, regardless of whether Doe 2's testimony constituted evidence of prior sexual conduct subject to Evidence Code section 782 requirements, it had minimal probative value with respect to her credibility. Because the trial court did not abuse its discretion in excluding the evidence, defense counsel was not ineffective for failing to follow the procedures of Evidence Code section 782.

## 2. Eliciting Prejudicial Expert Testimony Regarding Infrequency of False Reports of Child Molestation

Defendant next contends his trial counsel was ineffective for eliciting testimony from the prosecution's child sexual abuse accommodation syndrome (CSAAS) expert on the infrequency of false reports of child molestation.[7] During motions in limine, the trial court excluded expert testimony "regarding statistical percentages of false allegations" of child molestation. The trial court ruled "it is improper for [the] CSAAS expert or

---

[7] CSAAS evidence is admissible to disabuse jurors of common misconceptions about how child victims of sexual assault behave. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) Testimony by an expert on CSAAS allows jurors to understand the reactions of children who have been the victims of sexual abuse, but it is inadmissible to prove that a victim's claim of molestation is true. (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *McAlpin*, at pp. 1300–1301.)

any other expert to rely on statistics as to how often children in these situations lie."

When he cross-examined the prosecution's CSAAS expert, defense counsel asked the expert whether he had ever worked with children "who claim to be sexually abused but as far as could be determined were not." The expert stated he did not recall that occurring. Defense counsel then asked whether the expert had any "experience with children who claimed to be abused but [the claim] was not substantiated." Again, the expert did not recall that having occurred. When the expert asked if counsel was asking about false allegations, defense counsel confirmed he was. The expert said, "It's infrequent but it can happen." Defense counsel then asked the basis for the statement that false allegations of child sexual abuse are infrequent. At that point, the prosecutor asked to approach. After a sidebar, the trial court instructed the jury: "Ladies and gentlemen, you are not to consider the testimony as to the frequency of reporting, either accurate or inaccurate."

Relying primarily on *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*), defendant contends his trial counsel rendered ineffective assistance by soliciting evidence the trial court had excluded about the infrequency of false child molestation allegations. In *Julian*, the CSAAS expert repeatedly testified to specific statistics supporting the rarity of false reports of child abuse based on various studies and articles. (*Id.* at pp. 883–884.) The appellate court concluded defense counsel was ineffective for failing to object to the expert's testimony, and the defendant was prejudiced because the case was close, the evidence in defendant's favor was strong, and the expert's repeated testimony regarding the rarity of false allegations "tipped the scales in favor of the People based on statistical studies that were irrelevant to the issue of Julian's guilt or innocence." (*Id.* at p. 888.) Specifically, the court

28

noted, "Such evidence may not be prejudicial where it occurs in a slight passing reference by the expert. But here the jury was bombarded with it." (*Ibid.*)

In this case, however, unlike in *Julian*, defendant cannot show he was prejudiced by counsel's alleged deficient performance.[8] (*Strickland*, *supra*, 466 U.S. at p. 697 [court need not assess deficient performance if ineffective assistance claim can be resolved due to lack of sufficient prejudice].) The reference to the infrequency of false allegations was exceptionally brief, the evidence of guilt was overwhelming, and the trial court instructed the jury immediately after the testimony not to consider the testimony as to the frequency or infrequency of reporting *and* properly instructed the jury at the conclusion of trial on the use of expert CSAAS testimony and evaluation of witness credibility. On this record, defendant cannot show a reasonable probability the outcome of the trial would have been different in the absence of the purported error.

### 3. Failure to Object to Character Evidence

As discussed above, we have already rejected defendant's claim that reversal is compelled because the trial court admitted improper,

---

[8] Defendant also relies on *People v. Lapenias* (2021) 67 Cal.App.5th 162 and *People v. Wilson* (2019) 33 Cal.App.5th 559, but those cases are likewise unhelpful to defendant. In *Lapenias*, the court found the error in allowing expert testimony that false allegations were " 'rare' " was harmless because, like here, the CSAAS expert's testimony was brief, the victim's disclosure provided corroborative evidence of the defendant's guilt, and the jury was properly instructed on use of the evidence. (*Lapenias,* at pp. 179–180.) Similarly, in *Wilson*, the appellate court concluded inadmissible statistical evidence regarding the infrequency of false abuse allegations resulted in no prejudice to the defendant where, among other things, the testimony on statistical evidence was brief and the victims testified extensively, allowing the jurors to assess their credibility. (*Wilson,* at pp. 571–572.) The same considerations apply here.

inflammatory, and irrelevant character evidence which served only to portray defendant as a "sexual deviant." Defendant contends his trial counsel's failure to object to evidence that he had an affair, contacted other women for prostitution, and trolled the Internet for prostitutes constituted ineffective assistance.

First, defendant's trial counsel may have had a reasonable, tactical reason for not objecting to the evidence. (See, e.g., *People v. Seumanu* (2015) 61 Cal.4th 1293, 1313, italics added by *Seumanu* [decision whether to object is a highly tactical decision that depends on " 'counsel's evaluation of the gravity of the problem *and whether objection or other responses would serve only to highlight the undesirable testimony*' "].) Counsel's defense theory relied in part on an argument that defendant's sexual conduct with adults had no tendency to prove he was a pedophile because children were not involved. Counsel may have refrained from objecting to avoid the impression that he considered the evidence harmful, in contradiction of the defense.

In any event, as we discussed above with respect to defendant's evidentiary claim, we conclude any error in failing to object was harmless because the evidence against defendant was overwhelming and the evidence regarding prostitutes and affairs with adults outside of marriage was much less inflammatory than the charges in the case. Because it is not reasonably probable defendant would have achieved a more favorable outcome had the evidence been excluded, his ineffective assistance claim fails. (*Strickland*, *supra*, 466 U.S. at p. 694.)

### 4. Failure to Object to Prosecutor's Cross-examination

We have also rejected above defendant's argument that the prosecutor committed misconduct by repeatedly asking W.D. about the expert's opinion that the videos found on defendant's computer were child pornography.

Defendant contends in the alternative that his counsel's failure to object to the improper questions constituted ineffective assistance. Because we rejected defendant's claim of prosecutorial misconduct and concluded defendant suffered no prejudice in light of the court's instruction to the jury, we reject the ineffective assistance claim.

### 5. Failure to Call Custodian of Records for Motherless.com

Defendant contends defense counsel failed to conduct an adequate investigation on behalf of his client. Specifically, defendant asserts his trial counsel should have called the custodian of records for motherless.com to testify the website was a federally regulated, adult pornography site.

During motions in limine when the parties and court were discussing the admission of search results from defendant's computer, the trial court stated that evidence defendant viewed child pornography would be the most relevant, while evidence he viewed adult pornography would be least relevant. The court further stated that if the images recovered from defendant's computer were found on a commercial website where the images are presumed to be adults, an expert would be required to identify the age of the models in order to argue the images were child pornography.

At the section 402 hearing, Rowberry testified he was not familiar with title 18 United States Code section 2257 (section 2257), as it pertains to child pornography regulations on commercial Internet sites, and he did not know whether motherless.com was certified under section 2257 regarding the age of the models depicted. When Rowberry was cross-examined at trial, defense counsel moved to exclude Rowberry's testimony. Counsel argued that during the section 402 hearing, he had asked Rowberry about section 2257 and whether the federal regulations require such websites to "keep records and have a custodian of records indicating that all models used and depicted are

31

. . . 18 years of age or older." Defense counsel argued that Rowberry had said he was not familiar, but would look into defense counsel's question; then at trial, Rowberry "claim[ed] ignorance" and said he didn't "understand that there are any regulations or rules." Defense counsel told the court Rowberry's testimony "puts me in a bind" and he had "been sucker punched by this witness" because he relied on Rowberry to look into the issue. Counsel asked the court to exclude "his entire testimony."

The prosecutor argued that Rowberry had no obligation to investigate on behalf of the defense, a point conceded by defendant's trial counsel. The trial court denied the motion, noting Rowberry was not an expert for the defense. The court further told defense counsel: "[Y]ou haven't asked him whether or not motherless.com is a commercial website. I think that the fact that he doesn't know more about the laws, the fact that you asked him to look at it and he said he didn't do it, that all goes to his credibility. You can certainly ask those questions. You can ask him questions about what he knows about that website, but it does not mean his entire testimony is excluded."

Defendant now contends his trial counsel admitted that he knew Rowberry was not under a duty to investigate on behalf of the defense *and* that he knew there was a custodian of records at motherless.com. Accordingly, defendant argues, his trial counsel should have called the custodian of records to testify the website was federally regulated and required models to be 18 years of age or older.

We disagree. First, defendant does not point to any evidence in the record that a custodian of records exists or could have been secured to testify at trial. (See, e.g., *U.S. v. Harden* (9th Cir. 1988) 846 F.2d 1229, 1231–1232 [ineffective assistance of counsel claim failed because there was no evidence

32

in record that witness would testify].) Even assuming defense counsel was able to secure a custodian of records for motherless.com to testify about the site's compliance with legal regulations, however, the evidence would have had minimal probative value. Rowberry would still have been able to testify that based on his experience, he had only ever seen motherless.com in child molestation investigations and that the search results from defendant's computer revealed a search for the terms " 'teen' " and " 'young teen' " on the website. Moreover, Rowberry testified the website was a legal, commercial website. It is unlikely additional testimony from a custodian of records about its legal compliance would have made a difference in the jury's assessment of defendant's use of the site. Because there is no reasonable probability that such testimony would have changed the outcome at trial, defense counsel was not ineffective for failing to conduct the investigation and call the hypothetical witness.

### 6. Failure to Object to Restitution Fine

Finally, defendant contends his trial counsel rendered ineffective assistance by failing to request an ability-to-pay hearing on the imposition of a cumulative total of $5,070 in fines and fees under *People v. Dueñas* (2019) 30 Cal.App.5th 1157. Since we must remand this matter for resentencing as we discuss further below, it is not necessary to address defendant's claim at this time. At his resentencing on remand, defendant may make any appropriate motions. (*People v. Buycks* (2018) 5 Cal.5th 857, 893 [explaining full resentencing rule].)

## F. Cumulative Error

Defendant contends the cumulative effect of the multiple errors at trial identified above requires reversal of the judgment. We disagree.

Under the cumulative error doctrine, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) As we have discussed in detail above, we have rejected defendant's individual claims of error, and accordingly, there is no prejudice to accumulate. Any potential errors we have considered separately and found to be harmless; we reach the same conclusion considering them collectively.

## G. Sentencing

Finally, defendant argues he must be remanded for resentencing in light of recent changes to the law affecting the trial court's sentencing discretion. We agree.

The trial court sentenced defendant to the upper term of 16 years for continuous sexual abuse of Jane Doe 2 (Pen. Code, § 288.5, count 4) based on the following aggravating factors cited in the probation report: (1) the crime involved great violence, bodily harm, the threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court,[9] rule 4.421(a)(1));[10] (2) the victims were particularly vulnerable (rule 4.421(a)(3)); (3) the manner in which the offenses were carried out indicated "planning, some degree of sophistication"[11] (rule 4.421(a)(8)); (4) defendant took advantage of a position of trust or confidence (rule 4.421(a)(11)); and (5) defendant engaged in violent conduct indicating a serious danger to society (rule 4.421(b)(1)). The court acknowledged a single

---

[9] All references to rules are to the California Rules of Court.

[10] The court commented, "callousness. I think that's the operative word in this particular instance."

[11] The trial court noted it was not making a finding of professionalism.

mitigating factor that defendant's criminal history consisted of one misdemeanor conviction. (Rule 4.423(b)(1).)

When defendant was sentenced, Penal Code section 1170, subdivision (b) gave the trial court broad discretion to determine which of three terms specified for an offense would best serve the interests of justice. (Pen. Code, former § 1170, subd. (b), as amended by Stats. 2020, ch. 29, § 14.) While this appeal was pending, Penal Code section 1170 was amended by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567; Stats. 2021, ch. 731, § 1.3, effective Jan. 1, 2022.) As amended, Penal Code section 1170, subdivision (b) makes the middle term the presumptive sentence and permits imposition of an upper term sentence "only when there are circumstances in aggravation of the crime that justify" the upper term and only if "the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Pen. Code, § 1170, subd. (b)(2).) The parties agree, as do we, that revisions to Penal Code section 1170 are ameliorative within the meaning of *In re Estrada* (1965) 63 Cal.2d 740, and thus apply retroactively to nonfinal cases like this one. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109 (*Zabelle*) [noting all published cases to have considered the issue have found the new legislation applies retroactively].)

In this case, the court relied on factors that were not admitted by defendant, proved through certified records of conviction, or found true beyond a reasonable doubt by a jury. (Pen. Code, § 1170, subd. (b)(2), (3).) As such, consideration of the aggravating factors was improper under the newly amended statute. (See, e.g., *Zabelle*, *supra*, 80 Cal.App.5th at p. 1109.)

The parties disagree, however, as to whether we must remand for resentencing. Defendant contends Senate Bill 567 entitles him to a new

sentencing hearing, while the Attorney General argues remand is unnecessary because any error in sentencing was harmless.

The Courts of Appeal are split regarding the applicable standard of review in this situation, and the issue is currently pending before our Supreme Court. (*People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.)

In *People v. Flores* (2022) 75 Cal.App.5th 495, 500–501 (*Flores*), Division Three of this court held a remand for resentencing is unnecessary if the reviewing court can determine beyond a reasonable doubt that the jury would have found true at least one aggravating factor. (Accord, *People v. Salazar* (2022) 80 Cal.App.5th 453, 465, review granted Oct. 12, 2022, S275788.)

The court took a different approach in *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*), where the Fourth Appellate District, Division One concluded that a reviewing court must engage in a two-step analysis to determine harmlessness. (*Id.* at p. 467, fn. 11.) In the first step, the court asks whether it can conclude beyond a reasonable doubt that the jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied. If the answer to that question is yes, the error was harmless; if the answer is no, the court must proceed to the second step, where the court considers whether it is reasonably probable that the trial court would have imposed the upper terms "if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied."[12] (*Lopez,* at p. 467, fn. 11.)

---

[12] Other published decisions have agreed generally with the *Lopez* approach, but stated the test differently. (See *People v. Wandrey* (2022)

In *People v. Dunn* (2022) 81 Cal.App.5th 394 (*Dunn*), review granted October 12, 2022, S275655, the Fifth Appellate District adopted "a version of the standard articulated in *Lopez,* modified to incorporate *Watson* in the first step." (*Id.* at p. 409.) *Dunn* described the standard for assessing prejudice as follows: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is [no] reasonable probability that the jury would [not] have found any remaining aggravating circumstance(s) true beyond a reasonable doubt.[13] If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court

80 Cal.App.5th 962, 982, review granted Sept. 28, 2022, S275942 [court asks whether it is "certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court *and* whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term"]; *Zabelle, supra,* 80 Cal.App.5th at pp. 1111–1113 [court first considers under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) whether jury would have found, applying beyond a reasonable doubt standard, at least one aggravating factor true; then evaluates whether it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error].)

[13] When first stating the test, *Dunn* describes step "(1)(b)" of the standard as "whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt," but later describes that step as whether there is "a reasonable probability the jury would not have found the remaining aggravating circumstance true beyond a reasonable doubt." (*Dunn, supra,* 81 Cal.App.5th at p. 410.) The latter formulation is correct, as the question under *Watson* is whether there is a reasonable probability of a result more favorable to the defendant, not whether there is a reasonable probability that the same, unfavorable result would be reached again. (*Watson, supra,* 46 Cal.2d at p. 836.)

moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with [Penal Code] section 1170, subdivision (b)." (*Dunn*, at pp. 409–410, fn. omitted.)[14]

We need not choose amongst any of these tests, however, because we conclude under any of them, apart from *Flores*, remand for resentencing is required.[15]

---

[14] In *People v. Lewis* (2023) 88 Cal.App.5th 1125, a majority opinion from the Fourth Appellate District, Division Two proposed a two-step analysis which asks (1) whether a defendant *could* still be lawfully sentenced because the jury would have found at least one aggravating circumstance true beyond a reasonable doubt, and if so, asks (2) whether the record clearly indicates that the trial court *would* impose the same sentence under the new law. (*Id*. at pp. 1137–1138; but see *id*. at pp. 1141–1142 (conc. opn. of Raphael, J.) [expressing agreement with *Lopez* test and observing the majority's discussion of the second step was unnecessary because the majority had correctly concluded the court was unable to conclude beyond a reasonable doubt that a jury would find *any* of the three aggravating factors].) In *People v. Butler* (2023) 89 Cal.App.5th 953, a different panel of the same court agreed with and adopted the two-step method articulated in *Lopez*, noting the discussion of the second step in *Lewis* was dicta. (*Butler*, at p. 960, fn. 1.)

[15] For reasons explained by other courts, we decline to follow *Flores*. (See *Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11; *Dunn*, *supra*, 81 Cal.App.5th at p. 408.) We also note that in *People v. Ross* (2022) 86 Cal.App.5th 1346, 1354, review granted March 15, 2023, S278266, two of the panel members who decided *Flores* concluded "[u]pon reflection" that "the rationale for adding a state law harmless error component [is] both logical and compelling."

First, we conclude beyond a reasonable doubt that the jury would have found, beyond a reasonable doubt, at least one of the aggravating factors relied on by the trial court: that defendant abused a position of trust. (Rule 4.421(a)(11).)  We cannot, however, conclude the jury would have found the other aggravating factors true beyond a reasonable doubt, even under the more lenient *Watson* standard proposed in step 1(b) of the *Dunn* test.  As our Supreme Court explained in *People v. Sandoval* (2007) 41 Cal.4th 825, 840, "to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court."  Four of the five factors the trial court relied on in this case—that the victims were "particularly vulnerable" (rule 4.421(a)(3)); that defendant's acts disclosed "a high degree of cruelty, viciousness, or callousness" (rule 4.421(a)(1)); that the offenses involved "planning" (rule 4.421(a)(8)); and that defendant engaged in "violent conduct that indicates a serious danger to society" (rule 4.421(b)(1))—require "a subjective assessment of the circumstances rather than a straightforward finding of facts." (*Sandoval*,  at p. 840; see *People v. Wandrey*, *supra*, 80 Cal.App.5th at p. 983 [whether child molestation victim was "*particularly* vulnerable" or whether the defendant's offenses involved planning were subjective factors]; *People v. Ross*, *supra*, 86 Cal.App.5th at p. 1355 [whether victim was "*particularly* vulnerable" or crime involved acts disclosing "a *high degree* of cruelty, viciousness, or callousness" would require court to speculate that jury would have reached same conclusion as sentencing court].)  In other words, these factors are "not subject to clear standards," and require "an imprecise quantitative or comparative evaluation of the facts." (*Sandoval*,  at

p. 840.) In our view, there is a reasonable probability the jury would not have found these aggravating factors true beyond a reasonable doubt.

It is also difficult to conclude on this record that a jury would have found such aggravating factors beyond a reasonable doubt, given that defendant might have employed a different trial strategy or presented different evidence had he known the aggravating circumstances would be presented to the trier of fact. (See *Sandoval, supra,* 41 Cal.4th at p. 840 ["a reviewing court cannot always be confident that the factual record would have been the same had aggravating circumstances been charged and tried to the jury"]; *Lopez, supra,* 78 Cal.App.5th at p. 466 [court could not assess whether jury would have found aggravating factors true beyond a reasonable doubt since prior version of determinate sentencing law did not require prosecution to present evidence related to those factors at trial].) For example, at the time of his trial, defendant had no need to present evidence to the jury regarding his low risk of recidivism or minimal prior criminal history, but such evidence, reflected in his probation report, may have been relevant to a determination whether he poses "a serious danger to society." (Rule 4.421(b)(1).)

Because we cannot determine with sufficient certainty that some of the aggravating factors on which the trial court relied would have been found true if submitted to the jury, we proceed to the second step of the prejudice analysis. (See *Lopez, supra,* 78 Cal.App.5th at p. 467, fn. 11; *Dunn, supra,* 81 Cal.App.5th at p. 410.) When explaining its reasons for imposing the upper sentence, the trial court relied on the factors cited in the probation report and acknowledged the mitigating factor of his minimal prior criminal record. The court did not expressly weigh those factors. Further, the court commented that a harsher sentence urged by the victims and others was "not

40

within the realm of possibility," but also that "leniency, which is suggested on all the letters in support of [defendant], is *not contemplated by the statutory framework* in this particular case." (Italics added.) Given these circumstances, we believe there is a reasonable probability that the court would have imposed a different sentence had it realized it could not rely on some of the aggravating factors. Accordingly, we will remand the matter for resentencing. We express no opinion as to how the trial court should exercise its discretion on remand.[16]

## III. DISPOSITION

We reverse the sentences and remand the matter to the trial court so that it may resentence defendant consistent with Penal Code section 1170, subdivision (b), as amended by Senate Bill 567. The judgment is otherwise affirmed.

---

[16] On remand, the trial court should allow the prosecution to elect (1) to seek to prove aggravating factors beyond a reasonable doubt to a jury (or to the court, if a jury is waived), or (2) to accept resentencing on the existing record. (*Lopez, supra*, 78 Cal.App.5th at p. 469.)

MARGULIES, ACTING P. J.

WE CONCUR:

BANKE, J.

SWOPE, J.*

A164002
*People v. Dare*

---

* Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.